J. T. HOBBY AND SON, INC., A NORTH CAROLINA CORPORATION (SUCCESSOR CORPORATION TO HOBCO BUILDING COMPANY); ROBERT MONTGOMERY PAYNTER AND WIFE, SHIRLEY L. PAYNTER; THOMAS C. BOGLE AND WIFE, SARA M. BOGLE v. FAMILY HOMES OF WAKE COUNTY, INC., A CORPORATION

No. 7910SC1009

(Filed 20 May 1980)

**Deeds § 20.3— single family residential restrictive covenant—family care home as prohibited use**

A restrictive covenant limiting the use of subdivision lots to single family residences is violated by the use of a lot for a "family care home" in which a staff of caretakers and a house manager provide sheltered care for two to five mentally or physically infirm adults who pay for their care. Furthermore, such enforcement of the restrictive covenant does not violate the statute giving handicapped persons the right to reside in residential communities, homes and group homes, G.S. 168-9, since the residents are not prevented from living in the home because of their handicap.

APPEAL by defendant from *Smith (Donald L.), Judge.* Judgment entered 1 June 1979 in Superior Court, WAKE County. Heard in the Court of Appeals 18 April 1980.

The individual plaintiffs and the corporate defendant are owners of residential lots in Scarsdale Subdivision, Raleigh. J. T. Hobby and Son, Inc., is the successor corporate developer of the subdivision. Lots in the subdivision contain restrictive and protective covenants which affect all lots. The specific covenant at issue in this suit reads as follows:

No lot shall be used except for residential purposes, but nothing herein shall be construed to mean that a lot may not be converted to a street regardless of the type of use made of such street. No building shall be erected, altered, placed, or permitted to remain on any building unit other than one detached single-family dwelling not to exceed 2½ stories in height, a private garage for not more than three cars and out-building incidental to residential use. . . .

The Raleigh City Council passed an ordinance effective 22 May 1977 permitting what are known as "family care homes," to be located in residential areas. The defendant took title to lot 9, Block F, Scarsdale Subdivision, on 17 June 1977. Suit was filed by

plaintiffs one month later, seeking to restrain the defendant from using the property as a family care home. The matter was heard 31 May 1979, at which time orders of summary judgment and a permanent injunction favoring plaintiffs were entered. Defendant appealed.

*Seay, Rouse, Johnson, Harvey & Bolton, by James L. Seay and Ronald H. Garber, for plaintiffs appellee.*

*Theodore A. Nodell, Jr., for defendant appellant.*

HILL, Judge.

[1] Defendant contends the trial court erred by entering summary judgment in favor of the plaintiffs, there being a genuine issue of material fact present. In order to address defendant's contention, we are compelled to construe the restrictive covenant cited above. In other words, we must decide whether the operation of a "family care home" complies with the restriction that the lot on which the home is located be restricted to residential purposes, and whether any building located thereon meets the definition of a single family dwelling. The regulations defining a "family care home" promulgated by the North Carolina Department of Human Resources indicate it to be ". . . a small residence which provides sheltered care for two to five adults who, because of age or disability, require some personal services along with room and board to assure their safety and comfort." Such homes are licensed and include all boarding homes and rest homes which are for two to five adults who are aged or mentally or physically infirm, and who are not connected by blood or marriage to the person applying for a license to operate such a home. A charge is made for the resident's care. The residents are defined as "[a]ged or disabled persons residing in the home who pay for their care."

The facility is managed by an administrator who is not required to live at the facility, but, if not, he must employ a supervisor-in-charge. In brief, a staff of caretakers and a house manager are required to operate the facility, and the entire operation is licensed and strictly regulated. The cost of living in the home comes from two sources — an annual grant from the State of North Carolina and from the patient. The person in charge of the property which is the subject of this controversy appears to be a married couple. The other residents, all of whom

are unrelated retarded adults, have lived on the premises since the home opened in 1977.

In making application for the permit to operate the facility, the defendant was presented with several choices by which to categorize the property, including "Residential, Commercial, Office, Institutional, Day Care, and Industrial." The defendant indicated "*Institutional.*" It did *not* choose "Residential."

" 'Covenants and agreements restricting the free use of property are strictly construed against limitations upon such use. . . . Such construction in favor of the unrestricted use, however, must be reasonable. The strict rule of construction as to restrictions should not be applied in such a way as to defeat the plain and obvious purposes of a restriction.' " *Long v. Branham,* 271 N.C. 264, 268, 156 S.E. 2d 235 (1967), *citing* 20 Am. Jur. 2d, Covenants, Conditions and Restrictions § 187 (1965).

A careful examination of the factual situation *sub judice* leads us to the conclusion that the operation of the dwelling is more institutional than residential in nature. Certainly, the criteria for a single family residence is not met.

The North Carolina Supreme Court has defined "family" as being: "(1) those who live in the same household, subject to the general management and control of the head thereof; (2) [dependent] . . . upon such supervising, controlling and managing head; . . . (3) [wherein there is rendered] mutual gratuitous services with no intention on one hand of paying for such service and no expectation on the other of receiving reward or compensation." *McGee v. Crawford,* 205 N.C. 318, 321, 171 S.E. 326 (1933).

It is obvious that the above definition cannot be satisfied by the persons living in the dwelling which is the subject of this controversy. Here the supervisor-administrators, as well as other employees, are paid for their services. The defendant landowner is an operator of the home (though designated not for profit). The defendant molds policies concerning the operation of the home, and is subject to licensing as well as governmental supervision. Although the number of residents appears fixed, we can visualize a transition in the number of occupants with the idea being to maintain a full house at all times so as to make economical operation possible. The retarded persons do not pay the entire cost of

their room and board. The State pays portions of this cost, and the resident pays part. Outside members of the resident's family are encouraged to participate in the activities—even though not living on premises. No service appears to be gratuitous.

The operation of the home appears to go beyond even that of a "boarding" house. Courts have held that a boarding house violates residential covenants unless the keeping of a boarder is incidental to the use of the premises by a family. *See Annot.*, 14 A.L.R. 2d 1376, 1406 (1962). Here the keeping of boarders cannot be classified as incidental. The home is a business venture and appears to be a part of a business chain operated by defendant.

Defendant contends it has not changed any portion of the dwelling so as to preserve the single family residential character of the subdivision. Perhaps no architectural change has been made, but we are aware that "a house is not a home" in every situation. Here the house in an institution.

Defendant next contends the marital relationship between the caretakers would bring the relationship of the parties within the definition of "family" as required by the covenant. We have concluded there is indirect evidence of a husband-wife relationship in the record. However, the arguments previously presented would make this fact meaningless. We find that no issue of genuine material fact existed.

Next, defendants contend the entry of summary judgment was contrary to statute and public policy. Defendant quotes Judge Morris (now Chief Judge) in *Hale v. Moore*, 4 N.C. App. 374, 379, 167 S.E. 2d 12 (1969), as saying: " 'The courts have generally sustained covenants restricting the use of property where reasonable, [and] *not contrary to public policy*, not in restraint of trade and not for the purpose of creating a monopoly. . . .' " (Emphasis added.)

Defendant then cites G.S. 168-9 which provides that:

Each handicapped citizen shall have the same right as any other citizen to live and reside in residential communities, homes and group homes, and no person or group of persons, including governmental bodies or political subdivisions of the State, shall be permitted, or have the authority, to prevent any handicapped citizen, on the basis of his or her

handicap, from living and residing in residential communities, homes, and group homes on the same basis and conditions as any other citizen.

The statute clearly does not apply. The residents are not prevented from living in the home because of their handicap. The restrictive covenants do no violate G.S. 168-9.

We would reach a similar conclusion if the mentally retarded persons were of sound mind. Their handicap is not the issue. The issue is the operation of a commercial venture that violates the restriction. Defendant chose a location where private unilateral contracts ought to be honored by it in the same manner as by the other owners of lots in the subdivision.

The covenants at issue were on record in Wake County Courthouse long before the property was purchased by the defendant corporation. The covenants were open to public inspection. The plaintiffs presumably had purchased their homesites in Scarsdale, relying, at least partly, on the protection offered by the covenants. The limitations are beneficial to maintaining quality neighborhoods, and even defendant does not contend they are void. The covenants are an effort to limit the neighborhood to single family dwellings—precluding institutions.

Finally, we are not impressed with defendant's argument that upholding the covenants would be violative of defendant's constitutional rights. The record of the case does not reflect that any question of constitutional law was presented to or considered by the trial court. Such an issue will not be considered for the first time on appeal. *Wilcox v. Highway Comm.*, 279 N.C. 185, 181 S.E. 2d 435 (1971); *Carpenter v. Carpenter*, 25 N.C. App. 235, 212 S.E. 2d 911, *cert. den.* 287 N.C. 465 (1975).

The judgment of the trial court is

Affirmed.

Judges MARTIN (Robert M.) and WEBB concur.