IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-519

Filed: 2 January 2019

Cabarrus County, No. 17 CVS 2387

PROPST BROS. DISTS., INC., Plaintiff,

v.

SHREE KAMNATH CORP., Defendant,

and

McDONALD'S CORP., Third Party Intervenor.

Appeals by Defendant and Third Party Intervenor from declaratory judgment entered 5 February 2018 by Judge Martin B. McGee in Superior Court, Cabarrus County. Heard in the Court of Appeals 15 October 2018.

*Smith Moore Leatherwood LLP, by Matthew Nis Leerberg and Kip D. Nelson, for Plaintiff-Appellee.*

*Helms Robison Lee & Bennett, P.A., by R. Kenneth Helms, Jr. and Stephen M. Bennett, for Defendant-Appellant.*

*Womble Bond Dickinson (US) LLP, by Mark P. Henriques and Michael A. Ingersoll, for Third Party Intervenor.*

McGEE, Chief Judge.

I. Factual and Procedural History

Central Distributing Company sold a 6.31-acre tract of real property (the "Tract"), located in Cabarrus County, to Catawba Oil Company, Inc. ("Catawba Oil"), on 8 June 1990. The Tract was located directly northeast of the intersection of North

Carolina Highway 73 and Interstate 85. Catawba Oil subdivided the Tract in February 1998, which resulted in three separate lots: Lot 1, consisting of 3.06 acres; Lot 2, consisting of 2.55 acres; and Lot 3, consisting of 0.67 acres. The Tract is bisected by a non-exclusive private right-of-way granted to a landowner whose property borders the north end of the Tract. Lots 2 and 3 are on the western side of the right-of-way, while Lot 1 is on the eastern side. Lot 3 is adjacent to Lot 2, and makes up the easterly part of the southern border of Lot 2. The southern border of Lot 3 adjoins Highway 73. The 1998 survey of the subdivision of the Tract indicates that Propst Brothers Distributors, Inc. ("Propst") owned property adjoining the western border of Lot 3 and the southern border of Lot 2 at that time.

Catawba Oil conveyed the entirety of Lot 3 to Hillcrest Foods, Inc. ("Hillcrest") on 23 February 1998. The general warranty deed conveying Lot 3 to Hillcrest included two restrictive covenants (the "Deed Restrictions"):

> Grantee, or Waffle House, Inc., . . . or any subsequent grantee of theirs may not operate a drive-thru type food service restaurant on the real property granted by this deed so long as Grantor, or its successors, operates a drive-thru type food service restaurant in its convenience store on the tract adjacent to this property [Lot 1].

> No motor vehicle fuels may be sold or disposed from this real property so long as Grantor or any Grantee of Grantor sells or disposes motor vehicle fuels on [Lot 1.[1]]

---

[1] The wording of the Deed Restrictions would also include Lot 2. However, for the purposes of this appeal we only need to consider Lot 1.

- 2 -

At the time Lot 3 was conveyed to Hillcrest, Catawba Oil was operating a drive-thru type restaurant in a convenience store and selling motor vehicle fuels on Lot 1. A Waffle House was built on Lot 3 and operated for a number of years. Hillcrest then conveyed Lot 3 to the North Carolina Department of Transportation ("DOT") on 2 October 2013, and a portion of the southernmost part of Lot 3 was used by DOT for a "new right of way," and a "permanent utility easement for [a] N.C. Highway Project" involving Highway 73 and I-85. At some point in time, the Waffle House building and all related structures were razed.

Catawba Oil conveyed Lot 1 to Shree Kamnath Corp. ("Shree") on 10 March 2015. Shree operates a convenience store that sells motor vehicle fuels and includes a McDonald's Corporation ("McDonald's") restaurant franchise on Lot 1.

Catawba Oil conveyed Lot 2 to Propst on 28 May 2015. Catawba Oil did not add any restrictive covenants to the general warranty deed conveying Lot 2 to Propst. DOT conveyed the remaining portion of Lot 3 to Propst on 13 June 2017—being 0.434 acres that was not used for the "Highway Project." Therefore, at the time of this action, Propst owned all of the Tract on the western side of the private right-of-way. Propst anticipated that development of Lot 2 would involve construction of a "QuickTrips" convenience store and gas station, which might include a "QT Kitchen" ("QT")—a walk-in made-to-order food service business located inside the convenience

store.[2]  Although the QuickTrips would be located entirely on Lot 2, a portion of Lot 3 would be used for ingress and egress, and include some parking spaces for QuickTrip's use.

Propst filed a complaint for declaratory judgment on 9 August 2017, seeking a declaration that its proposed uses of Lot 3—the construction of a driveway and parking spaces to service the QuickTrip on Lot 2—would not violate the Deed Restrictions.  Shree filed an answer and counterclaim on 25 September 2017 seeking a declaratory judgment that the Deed Restrictions prohibited Propst's proposed uses of Lot 3.  McDonald's alleged that, as a tenant of Lot 1, it had a substantial legal interest in the proceeding, and was allowed to intervene in this action with the consent of Propst and Shree.  The matter was heard on 9 October 2017.  The trial court entered a declaratory judgment on 5 February 2018, ruling that the Deed Restrictions did not prohibit Propst's proposed uses of Lot 3.  Shree and McDonald's appeal.

## II. Standard of Review

"Our standard of review of a declaratory judgment is the same as in other cases." *Calhoun v. WHA Med. Clinic, PLLC*, 178 N.C. App. 585, 596, 632 S.E.2d 563,

---

[2] Propst's attorney informed the trial court that the exact nature of the development of Lot 2 was uncertain, stating that it was possible that "it could be just a gas station," but if the sale of made-to-order food was included, it would either be a QT, or some other arrangement that required the customer to walk into the convenience store to order and collect the food.  For the sake of this appeal, we will assume the development of Lot 2 will involve a QuickTrips that both sells motor vehicle fuels and includes a QT.

571 (2006) (citing N.C. Gen. Stat. § 1-258). "Accordingly, in a declaratory judgment action where the trial court decides questions of fact, we review the challenged findings of fact and determine whether they are supported by competent evidence. . . . . We review the trial court's conclusions of law *de novo.*" *Id.* at 596–97, 632 S.E.2d at 571 (citations omitted). In the present case, the relevant facts have been stipulated to by Propst, Shree, and McDonald's.

### III. Shree's Appeal

Shree's sole argument is that Propst's "proposed use of Lot 3 as access and parking to serve the sale or disposal of motor vehicle fuels on Lot 2 violates the Deed Restrictions" and, therefore, the trial court erred in ruling otherwise in the declaratory judgment. We disagree.

It is undisputed that the Deed Restrictions apply to Lot 3. Therefore, our review is limited to whether the Deed Restrictions prevent the intended use of Lot 3. The Deed Restriction relevant to Shree's appeal reads as follows: "No motor vehicle fuels may be sold or disposed from [Lot 3] so long as Grantor or any Grantee of Grantor sells or disposes motor vehicle fuels on [Lot 1]" (the "Fuel Restriction"). Shree has stipulated that "[t]he intended construction on Lot 3 by Propst [] will only establish parking and egress for Lot 2." Therefore, the intended uses of Lot 3— parking, ingress, and egress—standing alone, do not violate the Fuel Restriction. Propst intends to sell "motor vehicle fuels" on Lot 2; however, Lot 2 is unencumbered

by any restrictive covenants relevant to this appeal, and Propst is free to sell motor vehicle fuels on Lot 2.

This Court is ever cognizant that determinations concerning restrictive covenants are fact specific. As our Supreme Court has made clear: "Each case must be determined on its own particular facts." *Long v. Branham*, 271 N.C. 264, 274, 156 S.E.2d 235, 242–43 (1967) (citation omitted). Shree's argument is that, even though Propst is free to operate a gas station on Lot 2, use of Lot 3 to help facilitate the sale of motor vehicle fuels would violate the Fuel Restriction. Shree states that "the trial court overlooked the purpose of the [Fuel] Restriction[] in favor of an overly strict construction." In support of its argument, Shree relies heavily on three cases from our Supreme Court: *Long*, 271 N.C. 264, 156 S.E.2d 235; *Realty Co. v. Hobbs*, 261 N.C. 414, 135 S.E.2d 30 (1964); and *Starmount Co. v. Memorial Park*, 233 N.C. 613, 65 S.E.2d 134 (1951).

We first note there are two kinds of restrictive covenants that may encumber real property—"affirmative" and "negative." Our Supreme Court in *Long*, *Realty Company*, and *Starmount*, was considering "affirmative" covenants. In *Long*, the restrictive covenant provided: "[N]o lot in Timbercrest Subdivision 'shall be used *except for* residential purposes[.]'" *Long*, 271 N.C. at 268, 156 S.E.2d at 238 (emphasis added). In other words, the covenant in *Long* "affirmatively" allowed use of the encumbered property for *solely* "residential purposes," and thereby prohibited *any*

use of the encumbered property that was *not* for residential purposes. *Id.* When, for example, this Court construes an "affirmative" covenant that restricts use of real property to "residential purposes," use of that encumbered property for any commercial or other non-residential purpose, *even if the encumbered property is used for a residential purpose as well*, would violate the "affirmative" restriction:

> While conceding the drainage system may serve a commercial purpose, [the appellant] argues that since it also serves the residential community by preventing flooding, it should be considered a residential use of the property. We find this argument unconvincing when the plain language of the covenant states: "This property shall be used for residential purposes *only*." (emphasis added). The expression "shall be used for residential purposes only" is not ambiguous. As used in this covenant, the word "only" is synonymous with the word "solely" and is the same as the phrase "and nothing else."

*Buie v. High Point Associates Ltd. Partnership*, 119 N.C. App. 155, 159, 458 S.E.2d 212, 215 (1995).

Our Supreme Court in *Long* held:

> It is quite clear that the use or grant of a right-of-way across property restricted to residential use to reach property used for business, commercial, or other forbidden enterprises violates the restrictive covenants. Restricted property cannot be made to serve a forbidden use even though the enterprise is situated on adjacent or restricted land.

*Long*, 271 N.C. at 269, 156 S.E.2d at 239 (citations omitted). We expressly disavow Shree's contention, concerning the "affirmative" covenant opinions cited above, that

this "line of cases have treated restrictive covenants as barring not just literally listed uses, but also uses that are integrally related. This line of cases demonstrates that when a covenant prohibits a retail business, it prohibits parking for and access to that business as well." Contrary to Shree's assertions, this line of cases stands for the proposition that whether the use of a property encumbered by an "affirmative" covenant is permissible will sometimes be determined by the nature of the use of an adjacent property—*so long as the encumbered property is being used, in some relevant manner, in service of the adjacent property. Id.* A parking lot servicing a business is being used for a commercial purpose; a parking lot that *only* services a *solely* residential development is likely not.[3] "[O]rdinarily the opening or maintenance of a street or a right-of-way 'for the better enjoyment of residential property as such does not violate a covenant restricting the property to residential purposes[.]'" *Riverview Property Owners Assoc. v. Hewett*, 90 N.C. App. 753, 754, 370 S.E.2d 53, 54 (1988) (citation omitted). "[W]hether traveling over a lot restricted to residential purposes in getting to adjacent property violates the restriction *depends upon the circumstances involved.*" *Id.* (citation omitted) (emphasis added). *Long*, *Realty Company*, and *Starmount* did not determine that "restrictive covenants" bar "not just literally listed uses, but also uses that are integrally related[,]" because no such

---

[3] Sometimes the grantor's intent, discernable from amendments or other relevant documents, may clearly demonstrate that a more restrictive meaning of "residential purposes" applies to a restrictive covenant. *See Long*, 271 N.C. at 274, 156 S.E.2d at 243.

determination was necessary to reach the holdings in those opinions. A determination that the use of certain property for a driveway servicing a business is not a residential use of that property—and therefore violates an "affirmative" covenant limiting use of that property to solely residential purposes—is not a determination that the driveway of a business must be treated as if it is the business itself when construing restrictive covenants.

In the present case, the Fuel Restriction is not an "affirmative" covenant. It is a "negative" covenant, because, instead of *mandating* that Lot 3 *only* be used *for* a specific purpose—e.g. "residential purposes only"—it includes a *single prohibited use*—sale of "motor vehicle fuels . . . from [Lot 3]." *See Russell v. Donaldson*, 222 N.C. App. 702, 706, 731 S.E.2d 535, 538 (2012). The Fuel Restriction does not interfere with any other potential uses of Lot 3. Because of these significant differences, this Court has found opinions construing "affirmative" covenants "not sufficiently similar [to opinions construing 'negative' covenants] . . . to be binding authority."[4] *Id.* Pursuant to a plain reading of the Fuel Restriction, every use of Lot 3 *other* than the "sale" or "disposal" of "motor vehicle fuels . . . from [Lot 3]" is permitted. On its face, construction and use of a driveway and parking spaces do not constitute sale of "motor vehicle fuels . . . from [Lot 3]."

---

[4] Shree attempts to dismiss the relevance of the "affirmative" covenant and "negative" covenant distinction by pointing out that the same rules of construction apply to both. However, the distinction lies not in what rules of construction apply, but in how the prohibited activities are defined, and in how that might impact application of the relevant rules of construction.

However, Shree argues, because the intended uses of the driveway and parking spaces are to service a business that—among other things—sells "motor vehicle fuels," we should consider these intended uses of Lot 3 to be functionally equivalent to the actual sale of "motor vehicle fuels . . . from [Lot 3]." We find *Long*, *Realty Company*, and *Starmount* inapposite, as the Fuel Restriction does not mandate that Lot 3 be used *for* a particular purpose that Propst's proposed use violates.

Shree also cites this Court's opinion in *Charlotte Pavilion Rd. Retail Inv., LLC v. N.C. CVS Pharmacy, LLC*, 238 N.C. App. 10, 767 S.E.2d 105 (2014), that involved a "negative" covenant that stated the encumbered property "shall not 'be used for the purpose of a health and beauty aids store, a drug store, a vitamin store or a pharmacy.'" *Id.* at 13, 767 S.E.2d at 108. This Court explained:

> This covenant must be construed according to the plain ordinary meaning of its words. [Appellant] CVS argues that the restrictive covenant . . . prohibits the construction of a parking lot that would serve Walmart. It is CVS's position that the purpose of the restrictive covenant is to prohibit the construction of a pharmacy on the restricted parcel that would compete with CVS—this includes the prohibition of a parking lot which would serve a prohibited use. CVS notes that because the city of Charlotte's ordinance requires Walmart to provide parking for its customers, parking is integral to the store's operation and therefore falls within the purview of the restrictive covenant.

*Id.* at 13–14, 767 S.E.2d at 108. However, construing any ambiguities in the restrictive covenant against enforcement, this Court in *Charlotte Pavilion* rejected

CVS's argument and held that the restrictive covenant did not prevent the use of the

encumbered property as a parking lot in service of the competing Walmart:

> In the instant case, we interpret the restrictive covenant to prohibit exactly what it purports to ban on the face of the restriction—the erection of a *structure* on the . . . tract that operates as a prohibited type of retail store, namely a pharmacy. Thus, a developer may not build a store—four walls and a roof—that constitutes a vitamin store, beauty aid store, or pharmacy. We do not believe that the intent of the grantor . . . was to outlaw the construction of those things which are integral or essential to the *operation* of a retail business. *If such prohibition was intended, the drafter could have said as much by incorporating phrases such as "used for store purposes" or "used for purposes incidental to a store."* However, *without more*, we conclude the construction of a parking lot and access easement on the restricted property is not a prohibited use.

*Id.* at 15, 767 S.E.2d at 108–09 (some emphasis added).[5] The rules of construction

for restrictive covenants as recognized by our appellate courts compelled the outcome

---

[5] We recognize that, in *dicta* considering an opinion from Texas, this Court noted the Texas opinion held that a restrictive covenant banning the "*activity*" of operating a business on the encumbered property also banned that property from being used for any "'integral part of the proposed'" business—even when the actual business was located on an adjacent lot. The Texas court further held that a parking lot was such an "integral part" of the prohibited business, and subject to the restrictive covenant. *Id.* at 14-15, 767 S.E.2d at 108 (citation omitted). However, as well as being a non-binding opinion from another jurisdiction, this Court determined that the Texas case was inapposite on its facts—because the restrictive covenant in *Charlotte Pavilion* banned the *physical presence* of a business on the encumbered property, not the *operation of* that business. *Id.* at 15, 767 S.E.2d at 108-09. Shree incorrectly asserts that this Court's discussion of the Texas opinion constituted "accept[ance of] the idea of parking as an integral use to a retail business." Instead, this Court in *Charlotte Pavilion* merely noted that the restrictive covenant at issue could have been drafted in a manner that excluded uses "integral" to the operation of the prohibited business, but was not so drafted. *Id.* We believe whether a parking lot is "integral" to a business, and how that determination will impact the application of a restrictive covenant in a particular case, will depend on the specific facts of that case—including how the restrictive covenant in question was drafted. *Long*, 271 N.C. at 274, 156 S.E.2d at 242-43 (citation omitted) ("Each case must be determined on its own particular facts.").

in *Charlotte Pavilion.* "While the intentions of the parties to restrictive covenants ordinarily control the construction of the covenants, such covenants are not favored by the law, and they will be strictly construed to the end that all ambiguities will be resolved in favor of the unrestrained use of land." *Hobby & Son v. Family Homes*, 302 N.C. 64, 70, 274 S.E.2d 174, 179 (1981) (citations omitted). "The rule of strict construction is grounded in sound consideration of public policy: It is in the best interests of society that the free and unrestricted use and enjoyment of land be encouraged to its fullest extent." *Id.* at 71, 274 S.E.2d at 179 (citations omitted). "'The law looks with disfavor upon covenants restricting the free use of property. As a consequence, the law declares that nothing can be read into a restrictive covenant enlarging its meaning beyond what its language plainly and unmistakably imports.'" *Russell*, 222 N.C. App. at 705, 731 S.E.2d at 538 (citation omitted).

There was no necessity to read any unwritten intent into the "affirmative" covenants at issue in *Long*, *Realty Company*, *Starmount*, and *Buie* in order to find violations of those covenants. "A restriction of the enjoyment of property must be created in express terms, or by plain and unmistakable implication." *Starmount*, 233 N.C. at 616, 65 S.E.2d at 136 (citation omitted). By contrast, for this Court to hold that the intended use of Lot 3 violated the Fuel Restriction, we would have to read an intent into the Fuel Restriction that does not exist in its plain language. *Russell*, 222 N.C. App. at 705, 731 S.E.2d at 538.

It is correct that "the fundamental rule is that the intention of the parties governs, and that their intention must be gathered from study and consideration of *all* the covenants contained in the instrument or instruments creating the restrictions." *Long*, 271 N.C. at 268, 156 S.E.2d at 238 (citation omitted). However:

> "Such restrictions *will not be aided or extended by implication or enlarged by construction to affect lands not specifically described*, or to grant rights to persons in whose favor it is not clearly shown such restrictions are to apply. *Doubt will be resolved in favor of the unrestricted use of property*, so that *where the language of a restrictive covenant is capable of two constructions, the one that limits, rather than the one which extends it, should be adopted, and that construction should be embraced which least restricts the free use of the land.*"

*Id.* at 268, 156 S.E.2d at 239 (citation omitted) (emphasis added).

We hold that there is, at a minimum, doubt concerning whether the proposed uses of Lot 3 violate the Fuel Restriction. Even assuming, *arguendo*, the Fuel Restriction can be read as prohibiting Propst's proposed uses of Lot 3, it can also be read as permitting them. Therefore, our rules of construction dictate that we hold in favor of the free use of Lot 3, and affirm the trial court. *Id.*; *see also Starmount*, 233 N.C. at 616, 65 S.E.2d at 136.

## IV. McDonald's Appeal

McDonald's argues "the trial court erred in concluding that [Propst's] proposed development does not violate the Deed Restrictions." We disagree.

The relevant restrictive covenant (the "Restaurant Restriction") states:

> Grantee, or Waffle House, Inc., . . . or any subsequent grantee of theirs may not operate a drive-thru type food service restaurant on [Lot 3] so long as Grantor, or its successors, operates a drive-thru type food service restaurant in its convenience store on [Lot 1].

It is undisputed that Propst is a subsequent grantee of Lot 3, that McDonald's is currently operating "a drive-thru type food service restaurant . . . on [Lot 1,]" that Propst's proposed development will not include a "restaurant . . . with a drive-thru type food service window" on Lot 2 or Lot 3, and that "[t]he purpose of the improvements to Lot 3 shall be an entry and exit drive and limited parking[.]" Propst intends "to improve Lots 2 and 3 such that Lot 3 will provide parking and ingress/egress for the benefit of Lot 2 and a convenience store will be constructed on Lot 2. The convenience store will not have a drive-thru type food service window," but "may use touch screens to sell made-to-order fast foods which are consumed in the car or at home" that will require customers to "exit their vehicle[s] to order and get food prepared and/or sold on Lot 2."

McDonald's argues that the language "drive-thru type food service restaurant" does not specifically limit the Restaurant Restriction to restaurants that provide actual drive-thru service. Although "the fundamental rule is that the intention of the parties governs, and that their intention must be gathered from study and consideration of *all* the covenants contained in the instrument or instruments creating the restrictions[,]" *Long*, 271 N.C. at 268, 156 S.E.2d at 238 (citation

omitted), considering all the relevant documents in this case, it is not at all clear that "the plain and obvious purpose[] of [the Restaurant R]estriction" was to exclude the type of food service operation proposed by Propst.[6] *Id.* at 268, 156 S.E.2d at 239 (citation and quotation marks omitted).

McDonald's fundamental argument is that the Restaurant Restriction bans the operation of any fast food type restaurant on Lot 3, and that the proposed QT

> is essentially a new drive-thru-type restaurant because of the way you go in, push something on the screen, get your food, you know, as you're paying for your gas and you've got that, essentially fast food restaurant exactly competitive with what McDonald's does whether it's a biscuit or the sandwich, you're getting it that same way that's different than a sit-down restaurant, it's different than a Waffle House, and our argument is it is a drive-thru-type restaurant.

Apparently, there are not tables in the QT for the purpose of eating its food in-store. We hold that the term "drive-thru type food service restaurant" is too ambiguous to prohibit the type of restaurant Propst proposes to operate on Lot 2—one in which customers must park and enter the convenience store in order to place an order, purchase, and pick up their food. *Id.* at 268, 156 S.E.2d at 239. "Drive-thru type" is not defined in the deed, and it can reasonably be read as prohibiting *only* traditional

---

[6] We also note that when Propst granted the roadway easement that bisects the Tract to the northerly adjacent property owner, the easement included a restrictive covenant stating the northerly adjoining property could "not be used for restaurant purposes for on site preparation, sale, and consumption of food" for a period of fifteen years. Propst was clearly capable of drafting a more expansive restrictive covenant than the one encumbering Lot 3.

fast food restaurants that have drive-thru windows—such as Burger King, Bojangles', or McDonald's. A reasonable argument could also be made that the Restaurant Restriction also prohibits restaurants that do *not* serve fast food, but that have a drive-thru window from which customers could pick up their "takeout" orders.

Even if we were to hold that "drive-thru type food service restaurant" could reasonably be interpreted as meaning "fast food type restaurant," and that QT is a "fast food type restaurant," McDonald's argument still fails. "[W]here the language of a restrictive covenant is capable of two constructions, the one that limits, rather than the one which extends it, should be adopted, and that construction should be embraced which least restricts the free use of the land." *Id.* (citation and quotation marks omitted). Applying the appropriate rules of construction, we adopt the construction of "drive-thru type food service restaurant" that limits its application solely to those restaurants that include an actual "drive-thru" service. We hold that the Restaurant Restriction would not prohibit the proposed QT or its equivalent from being built on *Lot 3*. Therefore, even if we assume, *arguendo*, that the driveway and parking spaces proposed for Lot 3 *would be a part of the QT* for the purposes of the Restaurant Restriction, Propst's proposed use of Lot 3 does not violate the Restaurant Restriction.

## V. Conclusion

Upon our *de novo* review, we hold that the trial court's findings of fact are supported by stipulation and competent evidence. *Calhoun*, 178 N.C. App. at 596-97, 632 S.E.2d at 571. We further hold that the trial court did not err in concluding:

> 6. [T]hat the term "drive-thru type food service restaurant" [in the Restaurant Restriction] means a restaurant with a traditional drive-thru window through which food is served. . . . .
>
> 7. Based on the specific facts stipulated here, . . . the proposed convenience store is not a "drive-thru type food service restaurant."
>
> 8. The restrictions on Lot 3 do not prohibit . . . parking and ingress and egress for the benefit of Lot 2 or any other property owned by the owner of Lot 2 when Lot 2, or any other property owned by the owner of Lot 2, is used as a convenience store with no drive-thru type food service restaurant, but sells or disposes of motor vehicle fuels.
>
> . . . .
>
> 10. The [trial court] further concludes that the proposed convenience store to be developed on Lot 2 does not violate the restriction on the sale or disposal of motor vehicle fuels from the restricted Lot 3.[7]

This Court cannot "rewrit[e] [a] restrictive covenant to add a limitation not currently there." *Winding Ridge Homeowners Ass'n v. Joffe*, 184 N.C. App. 629, 638, 646 S.E.2d 801, 807 (2007), *rev'd per curiam for the reasons stated in the dissent*, 362 N.C. 225,

---

[7] In Conclusion 9., the trial court stated that if "the proposed convenience store . . . qualified as a drive-thru type food service restaurant, the use of Lot 3 for parking and ingress/egress supporting the convenience store . . . would clearly violate the [Restaurant R]estriction." We make no determination regarding the legal correctness of Conclusion 9., because it has not been challenged on appeal.

657 S.E.2d 356 (2008) (J. Geer, dissenting). Therefore, we affirm the trial court's judgment that "Lots 2 and 3 can be improved as proposed by [Propst]."

AFFIRMED.

Judges ELMORE and ARROWOOD concur.

Judge Elmore concurred in this opinion prior to 31 December 2018.